UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

199

-------------------------------------- X

ANDREW YALE, on behalf of himself and  :
all others similarly situated,

    Plaintiff,             :     CIVIL ACTION NO.

    v.                   :

METROPOLITAN LIFE INSURANCE  :  **JURY TRIAL DEMANDED**
COMPANY,

    Defendant.

-------------------------------------- X

## CLASS ACTION COMPLAINT

Plaintiff, by his undersigned attorneys, for his complaint hereby allege as follows:

### Summary of the Action

1.    Andrew Yale, on behalf of himself and all others similarly situated, brings this action ("Action") individually and on behalf of all other persons and entities who, directly or indirectly, purchased, renewed, or paid premiums on life insurance issued by Metropolitan Life Insurance Company ("Metropolitan Life") from January 12, 2009, through January 12, 2015 (the "Class").

2.    In designating Metropolitan Life's parent, MetLife, Inc., a Systematically Important Financial Institution ("SIFI") on December 18, 2014, the Financial Stability Oversight Council issued an ominous warning:

As history has shown, including in 2008, financial crises can be hard to predict and can have consequences that are both far reaching and unanticipated . . . . There may be scenarios in which material financial distress at MetLife would not pose a threat to

U.S. financial stability, but there is a range of possible alternatives in which it could do so.

3.     This lawsuit ultimately is about how Metropolitan Life, in conjunction with its parent, MetLife, Inc., is engaging in conduct that imperils the financial future of Metropolitan Life's policyholders, their beneficiaries, and the public at large.  If Metropolitan Life were domiciled in certain states, there might be little that its policyholders could do about Metropolitan Life's conduct.  Over the past several decades, some states have been in a race to the bottom in terms of regulating insurers.  Metropolitan Life, however, is domiciled in New York, authorized to sell insurance here, and required to file non-misleading Statutory Annual Statements with the New York State Department of Financial Services ("NYDFS").

4.     Life insurance is essential to the financial security and peace of mind of millions of Americans.  Insurance regulators, including New York regulators, require that life insurers establish reserve liabilities ("reserves") for the expected claims for benefits under their life insurance policies and hold strong assets in support of these reserves to ensure that they are able to pay the expected claims.

5.     Because humans cannot forecast the future with perfect accuracy, insurance regulators also require life insurers to maintain a buffer of assets above their expected liabilities, *i.e.* capital, so they are able to pay claims arising from not only expected but also unexpected events—such as the massive, instantaneous loss of life that would take place in a pandemic, a terrorist attack, or other disaster.

6.      In July 2012, the NYDFS initiated an investigation into what it called the "shadow insurance" practices of New York-based life insurers, resulting in the issuance of a June 2013 report. *See generally* "Shining a Light on Shadow Insurance: A Little-Known Loophole That Puts Insurance Policyholders and Taxpayers at Greater Risk," NYDFS, June 2013 ("NYDFS Report").

7.      The NYDFS investigation revealed that, by using shadow insurance, at least seventeen of New York's eighty life insurance companies, including Metropolitan Life, were making their "capital buffers—which serve as shock absorbers against unexpected losses or financial shocks—appear larger and rosier than they actually are." *Id.* at 8.   These misrepresentations, according to the NYDFS Report, "potentially put the stability of the broader financial system at greater risk" and are "reminiscent of certain practices used in the run up to the financial crisis." *Id.* at 1.

8.      New York Insurance Law Section 4226 provides that no life insurer authorized to conduct business in the state of New York shall "make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates." N.Y. Ins. Law § 4226(a)(4).

9.      Section 4226 further provides that any insurer that knowingly violates the statute or knowingly receives any premium or compensation as a result of such violation shall "in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit." N.Y. Ins. Law § 4226(d).

10.    In 1906, the New York Legislature enacted the precursor to present day New York Insurance Law Section 4226 after a lengthy, and now famous, investigation by the Joint Committee of the Senate and Assembly of the State of New York into New York life insurance companies.   This investigation is commonly referred to as the Armstrong Committee Investigation.

11.    The New York Legislature initiated the Armstrong Committee Investigation in 1905 in reaction to claims that certain New York-based insurers were wasting corporate assets and using improper accounting techniques.   Jerry W. Markham, "A Financial History of the United States" Vol. II 18 (2002).

12.    Then, as now, issues surrounding the financial condition of life insurers were of utmost public importance and interest.   In fact, the issues were of such public interest that they soon helped catapult the chief investigator of the Armstrong Committee, a middle-aged lawyer named Charles Evans Hughes, into the New York Governor's Mansion.   From there, he successively became an Associate Justice of the United States Supreme Court, the Secretary of State of the United States, and the Chief Justice of the United States.

13.    Ensuring financial solvency and the adequacy of reserves remained important for years to come and to this day.   In 1939, the New York Legislature amended Section 4226 and gave policyholders a private right of action against offending life insurance companies. Act of June 15, 1939, ch. 882, § 211, 1939 N.Y. Sess. Laws 2530, 2714-15.   The amendments stated that an insurer that knowingly violates this section shall be liable "to a penalty in the amount of the sum so received by such violator as such premium or compensation, which

penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice act." *Id.* at 2714-15.

14.     From 1939 to the present, the relevant language of New York Insurance Law Section 4226 has remained largely unchanged.  The private right of action for the recovery of premiums paid due to misrepresentation of financial condition continues in the law as a deterrent to New York insurance companies that may be tempted to skimp on statutory reserve requirements, thereby misleading the public regarding their financial security.

15.     Metropolitan Life's use of shadow insurance constituted a misleading representation or a misrepresentation of the financial condition of Metropolitan Life and the adequacy of the reserves and reserve system upon which Metropolitan Life operates.

16.     Plaintiff brings this action on behalf of himself and a class of Metropolitan Life policyholders seeking a penalty against Metropolitan Life in the amount of the premiums they paid for their life insurance policies that were in effect during the Class Period, as provided by New York law.

### Parties

17.     Plaintiff is a resident and citizen of the state of New York.

18.     Plaintiff purchased a policy of life insurance issued by Metropolitan Life beginning in 2009.

19.     Members of the putative class are citizens of and reside in numerous states throughout the country.  Upon information and belief, more than two thirds of the members of the putative class reside outside the state of New York.

20.     Defendant Metropolitan Life is a life insurance company organized and existing under the laws of the state of New York, with its principal place of business in New York.

21.     Metropolitan Life is authorized by the State of New York to conduct the business of life insurance in New York.

## Jurisdiction and Venue

22.     This Court has jurisdiction over the subject matter of this Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), as the amount in controversy exceeds $5 million.

23.     Numerous members of the putative class are citizens of and reside in states other than New York.  Based on Metropolitan Life's report of the geographic distribution of its business included in its statutory annual statement, Plaintiff believes that more than two-thirds of the members of the putative class reside outside the state of New York.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) because a substantial part of Metropolitan Life's unlawful conduct occurred in this District and Metropolitan Life is a New York company with significant activities in this District.

25.     This Court has personal jurisdiction over Metropolitan Life by virtue of Metropolitan Life's significant business activities within this District.

## The NYDFS Investigation and Shadow Insurance

26.     In July 2012, the NYDFS initiated an investigation into the "shadow insurance" practices of life insurance companies based in New York.  This investigation led to the June 2013 NYDFS Report in which the NYDFS concluded that certain of these life

insurers, including Metropolitan Life, had used shadow insurance to conceal from the public, and their policyholders, the true extent of their exposure to the risk of financial loss.

27.    Insurance regulators, including New York regulators, require that life insurers establish reserve liabilities ("reserves") to ensure that they are able to pay the expected claims on the life insurance policies they sell. Insurers' reserves are usually the primary liabilities on their balance sheets. Life insurers must hold "admitted assets" in support of these reserves, which are generally high-quality assets that can be reliably liquidated to pay claims.

28.    The amount of assets that an insurer will ultimately need to pay future policyholders depends on numerous unknown variables, including interest rate changes, mortality rates, and policyholder lapses. For these reasons, insurance regulators, including New York regulators, require that life insurers establish reserve liabilities using prescribed formulas that take into account these factors and that include a buffer for the prospect that an insurer's actual experience will be worse than anticipated.

29.    Although reserve requirements are based on an insurer's likely projected risk, plus an additional buffer, they are sufficient to cover only a fraction of an insurer's actual exposure for policyholder claims. A substantial mortality event, such as the terrorist attacks of September 2001 or a pandemic, or a significant market disruption and loss of asset value, such as the financial crisis of 2008, could easily lead to policyholder claims in excess of the required reserves.

30.    In order to reduce the risk it has undertaken on the life insurance it has sold, an insurer has the option of purchasing reinsurance. However, the cedant life insurer is

ultimately responsible for paying policyholder claims, even when the underlying policy has been reinsured, if the reinsurer is unable or unwilling to pay the claim.

31.    Insurers may purchase reinsurance for a number of different reasons, including reducing the amount of assets they must keep in reserve.  However, regulations provide that life insurers can reduce their reserve liabilities and avoid dedicating admitted assets for the payment of reinsured policies (a process termed taking a reserve credit for reinsurance) only in certain instances.

32.    Because cedant life insurers are ultimately responsible for paying even reinsured policyholder claims, regulators permit them to take a reserve credit for reinsurance only when the cedant's regulators are confident in the financial ability of a reinsurer to pay claims when they become due.  Regulators consider two basic categories of reinsurance transactions sufficiently safe to warrant a cedant life insurer taking a reserve credit.

33.    First, regulators allow insurers to take reserve credit for reinsurance when they secure reinsurance through "authorized reinsurers," which are licensed or accredited by the cedant insurer's regulator.  Because authorized reinsurers are subject to approved enforcement regimes, reserve requirements and similar regulatory rules as are ceding insurers, regulators can be confident in their financial strength.

34.    Second, life insurers can take reserve credit for reinsurance from unauthorized reinsurers—which are not subject to direct oversight by the ceding insurer's regulator—in a more limited set of circumstances.  Typically, in order to qualify for a reserve credit, the unauthorized reinsurer must post adequate collateral for its potential obligations.  This collateral must amount to 100% of the reinsurer's obligations, and must be in a form that

8

can be easily and reliably collected. The two most common ways for an unauthorized reinsurer to provide this collateral are (1) for it to maintain a trust with a qualified US financial institution; or (2) for it to secure a clean, irrevocable, and "evergreen" letter of credit (LOC) from a US financial institution.

35.    The NYDFS investigation revealed, however, that many New York-based insurers, including Metropolitan Life, have effectively circumvented these rules by engaging in shadow insurance transactions.

36.    The typical shadow insurance transaction involves the following:   A life insurance company decides (1) that the reserve requirements under New York law are too high and (2) that it has better uses for its assets than supporting large reserves.  For example, rather than preserving assets as required by law to pay life insurance claims, it may use some or all that money to pay its executives higher salaries or to help it purchase other life insurance companies.

37.    The life insurance company (often called "the ceding insurer" or "the cedant insurer") then reinsures, or cedes, its risks on a block of life insurance business to an often thinly-capitalized "shell" subsidiary of the life insurance company's corporate parent, called a "captive reinsurer." The company-affiliated captive reinsurer typically is domiciled in a jurisdiction with lax and opaque regulatory oversight.

38.    The unauthorized company-affiliated captive reinsurers to which users of shadow insurance cede business are typically based in jurisdictions with reserve and capital requirements that are less strict than those applicable to the cedant insurer.  The cedant insurer finds these jurisdictions advantageous for a number of reasons.  First, most

company-affiliated captive reinsurers can use much less conservative accounting rules in calculating their reserve liabilities for ceded business than can a cedant insurer, which must account for those reserves under ordinary insurance regulatory rules, such as those promulgated by the State of New York and its insurance regulators. Second, company-affiliated captive reinsurers often face relaxed rules about what types of assets they can use to hold against the reserves that they do calculate. Third, capital rules for company-affiliated captive reinsurers are generally not risk-based, and often require the captive to maintain only a small and fixed level of capital that bears no relationship to the captive's actual risk exposures (and ultimately the policy obligations of the ceding insurer).

39.    Nevertheless, for the ceding insurer to be able to reduce its required reserves, the company-affiliated captive reinsurer usually must post collateral acceptable to the ceding insurer's more stringent regulator.   This often involves the company-affiliated captive reinsurer obtaining an LOC—an acceptable type of collateral—from a bank.

40.    After ceding business to a company-affiliated captive reinsurer, users of shadow insurance then take full reinsurance reserve credit for the reinsured policies. Because shadow insurance involves ceding business to an unauthorized company-affiliated captive reinsurer, insurers engaging in this practice must fully collateralize the company-affiliated captive reinsurer's obligations in accordance with various regulatory rules in order to take a reinsurance reserve credit.

41.    The "shadow" in shadow insurance involves the company-affiliated captive reinsurer obtaining that LOC or similar collateral, in whole or in part, based on the financial strength of a more financially secure affiliate within its holding company system—usually its

10

corporate parent company—rather than solely on the basis of the company-affiliated captive reinsurer's own financial strength. Typically, the parent company of the ceding insurer guarantees the company-affiliated captive reinsurer's obligations to the bank under the LOC (*i.e.*, a "parental guarantee"). As the term "shadow insurance" implies, insurers engaged in these transactions provide little or no disclosure of the parental guarantees backing these LOCs.

42.    As a result of these parental guarantees, shadow insurance transactions do not actually result in a complete transfer of the risk from cedant insurance companies. The risk that the company-affiliated captive reinsurer will be unable to make good on its reinsurance obligations is ultimately funneled back to the cedant insurer's parent by virtue of the parent company's guarantees in connection with the collateral used to support the shadow insurance transaction. This "financial alchemy" according to the NYDFS Report, constitutes nothing more than a "shell game[] to hide risk and loosen reserve requirements." NYDFS Report, at 1, 4.

### The Consequences of Parental Guarantees

43.    The NYDFS discovered that many of the parent companies of New York-based insurers that engaged in shadow insurance transactions had not established significant reserves to back the various forms of parental guarantees that they had provided in connection with these transactions. NYDFS Report, at 22. Indeed, most had established no reserves whatsoever to back the parental guarantees. *Id.*

44.    This lack of reserves puts policyholders at grave risk because of the potential unfunded liability that would be incurred by the parent company should a drawdown of the

LOC occur. Such a drawdown could lead to a liquidity crisis within the holding company system, which includes, among other entities, the parent company, the ceding insurer, and the company-affiliated captive reinsurer.

45.     This situation is exacerbated by the strong connection between the financial condition of the parent company and its operating insurance company subsidiaries. In the event that the parent company's guarantees under an LOC supporting shadow insurance transactions are actually triggered, the parent is likely already to be experiencing independent sources of financial stress. A parent's guarantee under an LOC will be triggered only if the company-affiliated captive reinsurer is unable to pay the claims it has assumed. This could be the result of various factors—including poor underwriting of the original claims, substantial changes in mortality experience, or substantial decreases in asset returns—that are likely to diminish financial health across the parent company's insurance operations, including the original cedant. Thus, the parent's potential exposure on an LOC guarantee in shadow insurance transactions is substantially correlated to its other potential risk exposures.

46.     Accordingly, funneling back to the parent company the consequences of the company-affiliated captive reinsurer being unable to meet its obligations exposes the parent company and the cedent insurer to substantial risks.

47.     One such risk involves the fact that shadow insurance leaves ceding insurers substantially exposed to the risks that they ostensibly reinsured in the shadow insurance transaction. The financial health of any insurance company is substantially related to the financial health of its parent company. This is because insurance companies that experience large capital deteriorations but that are part of a strong holding company can reliably expect

to receive capital infusions from their parent companies. Indeed, many of the insurance companies that experienced substantial capital strains during the 2008 financial crisis were able to recapitalize themselves relatively quickly because of large capital infusions from their parent companies. For this very reason, the health of an insurance company's parent company and holding company system is a material factor that private rating agencies use in assessing a company's financial strength.

48.     Another such risk stems from the fact that shadow insurance leaves ceding insurers substantially exposed to the prospect of a sudden balance sheet shock because the bank used to support the shadow insurance transaction could refuse to renew the supporting LOC if it had real, or imagined, concerns about the parent company's financial strength. Because the cedant insurer and the company-affiliated captive reinsurer obtained the LOC and the resulting reserve credit on the strength of the parental guarantee, the cedant's reserve funding has become tied to the creditworthiness of the parent company providing that guarantee.

49.     In August 2013, Moody's Investor Service issued a report warning of the dangers of shadow insurance. *See* "The Captive Triangle: Where Life Insurers' Reserve and Capital Requirements Disappear," Moody's Investor Service, August 23, 2013 ("Moody's Report"). The Moody's Report concluded that, when an insurer relies upon its holding company to adequately fund its reserves (as when a company-affiliated captive reinsurer uses an LOC backed by a parental guarantee as collateral to support a reinsurance transaction), "[t]his dependency of an insurer on its holding company's creditworthiness could be disastrous in a stressful environment." Moody's Report, at 4.

50.     Because the health of an insurer's parent is usually tied to the health of the insurer itself, an insurer that suffered a failure of its reserves due to the failure of a parental guarantee would be unlikely to be able to find other sources of funding for the reserves. Thus a financially troubled insurer would have inadequate funds to pay policyholder claims—exactly the outcome that the regulatory reserve requirements in New York are designed to prevent.

51.     As a result, shadow insurance transactions ultimately leave the ceding insurer and its policyholders substantially exposed to the very risk that the insurer had ostensibly transferred to the company-affiliated captive reinsurer and on the basis of which it had taken a corresponding reserve credit.

### Manipulating the Risk-Based Capital Ratio

52.     An insurer's capital is comprised roughly of its total assets minus its total liabilities. Capital provides policyholders with a number of critical protections. For instance, it helps ensure that the insurer, rather than its policyholder, bears the initial cost of unanticipated losses, thus providing a buffer against the insurer's insolvency. Relatedly, it encourages an insurer's owners and management to follow less risky business and investment strategies, because their own money is at risk in the event that those strategies prove unsuccessful.

53.     Risk-based capital represents the minimum amount of capital that an insurer should hold to protect policyholders against adverse developments. Regulators require risk-based capital to be determined by a formula that incorporates individualized measures of an insurer's main risk exposures, including its asset risks, interest rate risks, credit risks, and, in

the case of life insurers, its projected mortality risks. An insurer's capital strength is usually expressed as a risk-based capital ratio. The risk-based capital ratio is determined by dividing an insurer's Total Adjusted Capital (that is, the actual amount of capital and surplus the insurer has, plus other items that the risk-based capital instructions may provide) by its Authorized Control Level Risk-Based Capital (*i.e.*, the minimum amount of capital required under the risk-based capital formula). As the difference between these numbers increases, the higher its risk-based capital ratio becomes and the more secure an insurer appears.

54.     An insurance company's risk-based capital information, including its risk-based capital ratio, is a critical measure of the insurer's financial strength. An insurer's perceived financial strength is a material factor in purchasing and renewal decisions made by brokers, agents, and consumers interested in purchasing life insurance. Rating agencies, in particular, heavily weight insurers' total risk-based capital levels in assessing insurers' financial strength. Rating agencies and market participants generally expect life insurers to maintain risk-based capital ratios greater than 700% of their minimum capital requirements (*i.e.*, their authorized control levels).

55.     Because an insurer's risk-based capital ratio depends on its total capital, and its total capital depends on its aggregate assets and liabilities, insurers can boost their risk-based capital ratio and their apparent financial strength by reducing their reserve liabilities. By using shadow insurance to reduce reserve liabilities, an insurer's existing level of assets appear to provide policyholders with greater protection against loss than is actually the case.

56.     The NYDFS discovered that a number of New York-based life insurers, including Metropolitan Life, used the reserves they diverted by engaging in shadow

insurance transactions to artificially boost the risk-based capital ratio they reported to regulators, investors, rating agencies, and the general public—without actually raising any new capital or reducing risk. Thus the insurers' capital buffers, which serve as shock absorbers in the event of unexpected losses, were made to appear larger than they actually are.

57. The Moody's Report warned that shadow insurance transactions make the risk-based capital ratio, the prime measure of capital adequacy used to identify weakly capitalized life insurers, inaccurate as a measure of true capital adequacy. Moody's Report, at 4.

58. An article in the *Financial Times* reported that because life insurers "have offloaded" billions of dollars "worth of liabilities to subsidiaries in jurisdictions with weaker reserve rules, . . . policyholders [are exposed] to greater risks equivalent to three notches of an aggregate credit rating across the industry." Alistair Gray, "Shadow Insurance Schemes Multiply to $360bn," *Financial Times*, Sept. 30, 2013.

59. The *Financial Times* based its findings on the research of Ralph Koijen, Professor of Finance at London Business School, and Motohiro Yogo of the Federal Reserve Bank of Minneapolis. *See* Ralph Koijen & Motohiro Yogo, "Shadow Insurance," Apr. 1, 2014, *available at*, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2320921.

60. Professor Koijen stated that he could see "no obvious rationale" for engaging in shadow insurance "other than to circumvent regulatory requirements." Professor Koijen and Motohiro Yogo also estimated that the "size of the insurance market would shrink by about a fifth" if shadow insurance practices were eliminated.

16

Other Shadow Insurance Practices

**A.    Two-Step Transactions**

61.    Some insurers identified in the NYDFS Report, including Metropolitan Life, took shadow insurance a step further by using a practice the NYDFS calls "Two-Step Transactions," which allows New York-based insurers to further conceal the existence of certain shadow insurance practices.  In a Two-Step Transaction, the New York-based insurer cedes risk to a non-New York-based affiliate, which then reinsurers again (or "retrocedes") that risk to a company-affiliated captive reinsurer of the original New York insurer, often collateralizing the retrocession with a parental guarantee—the end result of this complex arrangement is that the New York-based insurer reports no direct transaction between it and a company-affiliated captive reinsurer, despite the presence of the parental guarantee backing the LOC collateralizing the retrocession.  NYDFS Report, at 4.

62.    Two-Step Transactions, therefore, can be and have been used to hide the existence of shadow insurance practices from regulators, rating agencies, and the general public, because there is no direct transaction between the original New York-based insurer and the company-affiliated captive reinsurer.

63.    The NYDFS Report explained that Two-Step Transactions are "particularly problematic" because the New York-domiciled insurer "is still ultimately on the hook for losses through a parental guarantee," even though the New York-based insurer reports no direct shadow insurance activity.  *Id.* at 4.  In other words, Two-Step Transactions, "obscure[] the risks that [New York-based] insurers are taking on through shadow insurance." *Id.*

64.     New York-based insurers, including Metropolitan Life, through their use of Two-Step Transactions, also made the capital buffers of their non-New York-based affiliates appear larger than they would be absent the use of shadow insurance.  The inflated capital buffers reported by the non-New York-based affiliates, in turn, improved the apparent financial strength of the New York insurers' overall holding company.  And because rating agencies look at the health of an insurer's holding company when assessing the financial strength of an individual insurer, the apparent increases in the capital buffers of non-New York-based affiliates inflated the perceived financial strength of the New York-based insurers themselves.

65.     Indeed, the parent companies of New York-based insurers often advertise the financial health of the overall holding company by touting the combined strength of their insurance subsidiaries, including the financial strength of non-New York-based affiliates that increased their capital buffers through the use of Two-Step Transactions.

66.     These misrepresentations, according to the NYDFS Report, "potentially put the stability of the broader financial system at greater risk" and are "reminiscent of certain practices used in the run up to the financial crisis." *Id.* at 1.

**B.     Hollow Assets**

67.     Two-Step Transactions are often used in combination with other troubling shadow insurance practices highlighted in the NYDFS Report.  These practices, which the NYDFS Report describes as "present[ing] serious potential risks to policyholders and taxpayers," include "Hollow Assets" (a practice that allows captive reinsurers to count

undrawn LOCs as assets, instead of requiring the captive to hold cash or a bond to satisfy its limited reserve requirements).  *Id.* at 4-5.

68.    Hollow Assets are shadow insurance transactions between cedant insurers and company-affiliated captive reinsurers where an LOC with a parental guarantee is recorded as an asset on the financial books of the company-affiliated captive reinsurer.

69.    New York does not allow insurers to count undrawn LOCs as admitted assets, even for company-affiliated captive reinsurers.  NYDFS Report, at 4-5.

70.    Hollow Assets are particularly problematic for two reasons:  First, it increases the likelihood that the captive affiliate will be unable to pay the reinsured claims because it does not have hard assets to pay those claims.  Second, this practice harms the ceding insurer because it exposes that insurer to the prospect that, at the precise time when it is experiencing financial distress (*i.e.*, when claims on policies are larger than expected), its parent company, which is guaranteeing the transaction, will also be exposed to financial stress as a result of its guarantee on the LOC.

71.    The NYDFS investigation found that a number of company-affiliated captive reinsurers of New York-based insurers, including MetLife Reinsurance Company of Vermont, a company-affiliated captive reinsurer of Metropolitan Life, reported undrawn LOCs as assets.

### Metropolitan Life's Extensive Use of Shadow Insurance

72.    Metropolitan Life is the life insurer identified in the NYDFS Report as "Case 1."

73.     In its 2011 statutory annual statement, which it issued on or around February 18, 2012, Metropolitan Life reported $1,184,000,000 in LOCs issued by banks to secure reinsurance obligations of several company-affiliated captive reinsurers.

74.     Metropolitan Life, as revealed by the NYDFS, also entered into a reinsurance treaty with a company-affiliated captive reinsurer whereby the captive issued surplus notes in the amount of $1,850,000,000 to fund part of the reinsurance transaction.

75.     The total amount of LOCs and surplus notes used by Metropolitan Life in connection with affiliated captive reinsurance transactions represented approximately 22 percent of its capital and surplus, $13,506,769,111, as of December 31, 2011.

76.     Metropolitan Life's LOCs in the amount of $1,184,000,000 were issued as collateral for reinsurance treaties and were backed by "contractual parental guarantees" from its ultimate parent.   In addition, the performance of the surplus notes in the amount of $1,850,000,000 was indemnified by Metropolitan Life's ultimate parent using an arrangement called a "Total Rate of Return Swap."[1]   Metropolitan Life increased its risk-based capital ratio by a whopping 109% as a result of these transactions.

77.     One company-affiliated captive reinsurer, MetLife Reinsurance Company of Vermont, then recorded the LOCs backed by "contractual parental guarantees" as admitted assets (*i.e.,* "Hollow Assets") on its balance sheet in the amount of $315,000,000.

---

[1] In its 2011 Annual Report on Form 10-K, MetLife, Inc. described how a Total Rate of Return Swap operates: "Total rate of return swaps ('TRRs') are swaps whereby the Company agrees with another party to exchange, at specified intervals, the difference between the economic risk and reward of an asset or a market index and the London Inter-Bank Offered Rate ('LIBOR'), calculated by reference to an agreed notional principal amount. No cash is exchanged at the outset of the contract. Cash is paid and received over the life of the contract based on the terms of the swap. These transactions are entered into pursuant to master agreements that provide for a single net payment to be made by the counterparty at each due date." MetLife, Inc., 2011 Annual Report (Form 10-K), at Item 8 "Financial Statements and Supplementary Data" at Footnote 4 (Feb. 28, 2012).

78.     In addition, as revealed by the NYDFS, Metropolitan Life engaged in Two-Step Transactions, ceding risks to non-New York-based affiliates who then retroceded some or all of that risk to company-affiliated captive reinsurers of Metropolitan Life.  NYDFS Report, at 7.

79.     Metropolitan Life reported in Column 5 of Schedule S-Part 4 of its 2011 statutory annual statement that it took a reserve credit in the amount of $2,947,745,838 on account of its reinsurance transactions with three company-affiliated captive reinsurers: MetLife Reinsurance Company of Vermont, Exeter Reassurance Company, Ltd., and Missouri Reinsurance (Barbados), Inc.

80.     Yet the reserve credit taken with respect to MetLife Reinsurance Company of Vermont, Exeter Reassurance Company, Ltd., and Missouri Reinsurance (Barbados), Inc. was not obtained on the financial strength of those captives.  Rather, it was obtained through undisclosed or inadequately disclosed guarantees and indemnifications from Metropolitan Life's ultimate parent.  Consequently, the aggregate reserve number in the amount of $104,229,724,910 listed on page 3 of Metropolitan Life's 2011 statutory annual statement is artificially low.  The artificially low aggregate reserve number on page 3, in turn, improved Metropolitan Life's risk-based capital ratio.

81.     Metropolitan Life's non-New York-based affiliates also reported using LOCs backed by "contractual parental guarantees" from Metropolitan Life's ultimate parent to secure reinsurance obligations of company-affiliated captive reinsurers.  NYDFS Report, at 10.  The non-New York-based-affiliates, as confirmed by the NYDFS, reported LOCs backed by "contractual parental guarantees" in the amount of $5.9 billion.  *Id.*

82.     One company-affiliated captive reinsurer, MetLife Reinsurance Company of Vermont, then recorded the LOCs backed by "contractual parental guarantees" as admitted assets (*i.e.*, "Hollow Assets") on its balance sheet in the amount of $4.1 billion.  *Id.*

83.     Metropolitan Life's non-New York-based affiliates, as result of these transactions, increased their individual risk-based capital ratios in amounts ranging from 211.3% to 634%, as of December 31, 2011.  *Id.*  The NYDFS Report also confirmed that the consolidated risk-based capital ratio for Metropolitan Life and its affiliates increased by 150.8% due to affiliated captive reinsurance transactions.   On information and belief, Metropolitan Life has continued to use captive reinsurance to artificially increase its risk-based capital ratio to the present.

84.     The actual financial strength of a life insurance company is a material factor not only for rating agencies and regulators, but also for consumers looking to purchase life insurance.  As a result, life insurance companies prominently advertise information about their financial strength and seek high ratings from respected rating agencies.

85.     Metropolitan Life reports on its website that "MetLife's trusted brand, capital strength, and existing relationships with millions of individual and institutional customers around the globe uniquely position MetLife among its competitors."  *MetLife Today*, MetLife, *available at* https://www.metlife.com/about/corporate-profile/metlife-history/metlife-today/index.html.

86.     Metropolitan Life's website further proclaims that "[a]t no time in the company's history has MetLife been as well positioned to capitalize on its history, its

reputation for security and stability, and its innovative products and services as it is today."
*Id.*

87.     In addition, Metropolitan Life prominently displays an A.M. Best rating of "A+," a Fitch rating of "AA-," a Moody's rating of "Aa3," and a Standard & Poor's rating of "AA-." *Company Ratings*, MetLife, *available at* https://www.metlife.com/about/corporate-profile/ratings/index.html?WT.ac=GN_about_corporate-profile_ratings.     In the life insurance industry, insurers use these ratings as a way to compete with others to obtain policyholders and their business.

88.     Ratings agencies, however, give considerable weight to risk-based capital ratios when they determine an insurer's financial strength rating.   Metropolitan Life increased its risk-based capital ratio as a result of its affiliated reinsurance transactions backed by inadequately disclosed "contractual parental guarantees" and indemnifications.   Metropolitan Life, in turn, reported this artificially inflated risk-based capital ratio to ratings agencies, which ultimately artificially elevated its financial strength rating.

89.     Indeed, Metropolitan Life publically acknowledged that truthfully accounting for the risk it cedes to captive reinsurers through shadow insurance transactions would negatively impact its credit ratings.   *See* Antoine Gara, "Moody's Disagrees on MetLife 'Shadow Insurance' Risk," *The Street*, June 17, 2013 ("Life Insurers use reinsurance subsidiaries to finance reserve requirements for term and universal life policies with secondary guarantees, MetLife says.   Any alternative to put those policies back on the balance sheet would come with big costs, the insurer states.   'Using equity could reduce

returns to levels below those required by investors and issuing debt could negatively impact credit ratings,' MetLife spokesperson John Calagna said in an e-mailed statement June 12.'").

## Metropolitan Life's Misrepresentations and Non-Disclosures

90.    Insurance companies are required to disclose their risk-based capital information in their statutory annual statements filed with insurance regulators.

91.    Because the risk-based capital ratio is often interpreted as a measure of the financial strength of an insurer by rating agencies, regulators, company management, customers, creditors, and investors, artificial boosts to a company's risk-based capital ratio materially affect consumers and their life insurance beneficiaries, and the life insurance market more generally.

92.    Metropolitan Life knowingly failed to adequately disclose its shadow insurance transactions with company-affiliated captive reinsurers that were collateralized using "contractual parental guarantees" in its statutory annual statements provided to New York regulators.

93.    Metropolitan Life knowingly failed to adequately disclose its shadow insurance transactions with company-affiliated captive reinsurers that were funded in part by surplus notes indemnified by Metropolitan Life's ultimate parent in its statutory annual statements provided to New York regulators.

94.    Metropolitan Life knowingly failed to adequately disclose its use of Two-Step Transactions in its statutory annual statements provided to New York regulators.

95.    Metropolitan Life knowingly failed to adequately disclose that certain company-affiliated captive reinsurers counted LOCs backed by parental guarantees as

admitted assets on the captive's balance sheet in Metropolitan Life's statutory annual statements provided to New York regulators.

96.   Metropolitan Life's failure to disclose its shadow insurance practices constituted a misrepresentation of its financial condition and its reserve system.

97.   Indeed, the New York Insurance Regulations explain that reinsurance arrangements that do not actually transfer all the significant risks of the insurance policies being reinsured have the effect of "distorting [the ceding insurer's] financial statements and not properly reflecting its financial condition." N.Y. Comp. Codes. R. & Regs. tit. 11, § 127.0(c)(2).

98.   Metropolitan Life's failure to disclose its shadow insurance practices constitutes a misleading statement or misrepresentation concerning Metropolitan Life's financial condition and its reserve system.

99.   Metropolitan Life's failure to disclose its shadow insurance practices caused Metropolitan Life's financial ratings to be artificially inflated. As MetLife is quoted by *The Street* in a June 17, 2013 article as stating, "moving policies back on its balance sheet could cause ratings downgrades [and] increase its cost of its capital."

## Class Action Allegations

100.   Plaintiff brings this action on behalf of himself and all others similarly situated as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

101.   Plaintiff proposes a Class defined as:

All persons and entities who, directly or indirectly, purchased, renewed, or paid premiums on life insurance policies issued by Metropolitan Life from January 12, 2009 through January 12, 2015.

Excluded from the class are past or present officers, directors, agents, brokers, or employees of Metropolitan Life or its parents or subsidiaries; any agents, brokers, or others who sold policies for Metropolitan Life, or its parents or subsidiaries; any entity in which Metropolitan Life has a controlling interest; the affiliates, legal representatives, attorneys or assigns of Metropolitan Life, or its parents or subsidiaries; any judge, justice, or judicial officers presiding over this matter and the staff and immediate family of any such judge, justice, or judicial officer.   Also excluded are the estates of any deceased that have been paid benefits under policies purchased during the class period.

102.   **Class Identity:**   The members of this Class are readily identifiable as Metropolitan Life policyholders and can be identified and located by Metropolitan Life's own records.

103.   **Numerosity:**  The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.  The exact number of Class members is unknown to Plaintiff at this time, but can be ascertained through appropriate discovery, since members of the proposed Class will be identified from records maintained by Metropolitan Life.   The Class is believed to have hundreds of thousands of members.

104.   **Typicality:**  Plaintiff's claims are typical of those of the Class members, and the relief sought is typical of the relief which would be sought by each Class member in separate actions.   Plaintiff's claims are based on the same legal theory as the claims of the other  Class  members  and  are  based  on  the  same  misleading  representations, misrepresentations, and omissions made by Metropolitan Life regarding Metropolitan Life's financial condition and the reserves backing the financial risk undertaken by Metropolitan

Life. Plaintiff and Class members are similarly aggrieved within the meaning of New York

Insurance Law Section 4226(d) as a result of Metropolitan Life's company-wide accounting

and financial reporting practices.

105.   **Adequacy:**   Plaintiff will fairly and adequately protect the interests of the

Class members. Plaintiff and the other Class Members were injured by the same misleading

representations, misrepresentations, and omissions made by Metropolitan Life regarding its

financial condition, reserve system, and available reserves, and Plaintiff has no interests that

are antagonistic or adverse to the interests of Class members. Plaintiff has retained counsel

competent and experienced in insurance law, reinsurance law and class action litigation and

who have been appointed by numerous courts to lead class actions and complex litigation.

106.   **Commonality:**   Common questions of law and fact exist as to all Class

members and predominate over any possible questions that might affect only individual

Class members. Among the questions of law and fact common to the proposed Class are:

a)   Whether Metropolitan Life failed to adequately disclose the contractual parental guarantees backing LOCs issued as collateral for affiliated reinsurance transactions;

b)   Whether Metropolitan Life failed to adequately disclose that its ultimate parent indemnified the performance of surplus notes used to partly fund affiliated reinsurance transactions;

c)   Whether Metropolitan Life artificially increased its reported risk-based capital ratio as a result of its use of LOCs backed by contractual parental guarantees and surplus notes indemnified by its ultimate parent in connection with affiliated reinsurance transactions;

d)   Whether Metropolitan Life's shadow insurance practices, as alleged herein, violate New York Insurance Law Section 4226.

107.   **Superiority:**  A class action is superior to any other possible method for the fair and efficient adjudication of the controversy for several reasons:

a)   Class action treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions would engender.

b)   Class members have little interest in individually controlling the prosecution of separate actions.  The substantial fees and costs required to challenge Metropolitan Life's wrongful conduct greatly exceed the penalty available to any individual Class member under New York Insurance Law Section 4226(d) and it would not be feasible or desirable for individual Class members to prosecute separate actions against Metropolitan Life.

c)   There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.  On the contrary, the expense and burden of litigation would make it difficult or impossible for individual Class members to maintain individual actions.  Moreover, even if such individual litigation were practicable, the cost to the court system of adjudication of individual litigation would be substantial.  This action will result in an orderly and expeditious administration of Class claims.  Economies of time, efforts, and expense will be fostered, and uniformity of decisions will be ensured.  In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

## COUNT I:  MISREPRESENTATION IN VIOLATION OF NEW YORK INSURANCE LAW, SECTION 4226

108.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.   New York Insurance Law Section 4226(a) imposes liability on any insurer that misrepresents its financial condition or the capital reserve system that it maintains to protect itself against the risk of financial loss.  N.Y. Ins. Law § 4226(a)(4) ("No insurer authorized to

do in this state the business of life, or accident and health insurance, or to make annuity contracts shall: . . . (4) make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates.").

110.    As set forth in this complaint, Metropolitan Life knowingly withheld from regulators and the public its "shadow insurance" practices, artificially inflating its risk-based capital ratio, and thereby misrepresenting the true extent of its exposure to the risk of financial loss, its financial condition, and the legal reserve system upon which it operates.

111.    As set forth in this complaint, Metropolitan Life knowingly violated N.Y. Ins. Law § 4226(d) and knowingly received premiums and other compensation in consequence of such violation.

112.    Although New York Insurance Law Section 4226 does not require that a purchaser of an insurance policy sustain or claim to have sustained damage or injury to bring a claim under that section, Plaintiff and members of the Class have paid premiums for life insurance policies that are less financially secure than Metropolitan Life represented them to be. Plaintiff and members of the Class have also paid inflated premiums for life insurance policies as a direct result of Metropolitan Life's conduct described in this complaint. Plaintiff and members of the Class have therefore been damaged and aggrieved by Metropolitan Life's misrepresentations, and misleading representations, concerning its financial condition and the reserves backing the financial risk undertaken by Metropolitan Life.

113.   As a consequence and direct result of Metropolitan Life's misleading representations and misrepresentations about its financial condition and its legal reserve system upon which it operates, Plaintiff and members of the Class are entitled to recover, as a statutory penalty, the premiums they have paid for their life insurance policies.  N.Y. Ins. Law § 4226(d) ("Any such insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice law and rules.").

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and judgment against Metropolitan Life as follows:

(a)   Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Appointing Plaintiff as the lead representative of the Class and appointing his counsel lead counsel for the Class;

(c)   Awarding a penalty in the amount of all premiums paid by Plaintiff and members of the Class to Metropolitan Life for life insurance policies that were in effect during the Class Period;

(d)   Awarding such other relief as the Court may deem just and proper.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

Dated: January _____, 2015

Respectfully submitted,

Keith W. Miller
KeithMiller@perkinscoie.com

**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, NY  10112
Telephone:  (212) 262-6900
Facsimile:  (212) 977-1649

David J. Harth
DHarth@perkinscoie.com
Timothy W. Burns
TBurns@perkinscoie.com
Jeff J. Bowen
JBowen@perkinscoie.com
Eric G. Barber
EBarber@perkinscoie.com
Freya K. Bowen
FBowen@perkinscoie.com
Rhett P. Martin
RMartin@perkinscoie.com
Jesse J. Bair
JBair@perkinscoie.com

**PERKINS COIE LLP**
One East Main Street, Suite 201
Madison, WI  53703
Telephone:  (608) 663-7460
Facsimile: (608) 663-7499

Shawn M. Raiter
sraiter@larsonking.com

**LARSON • KING LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN  55101
Telephone:  (651) 312-6518
Facsimile:  (651) 312-6618

*Attorneys for Plaintiff and Putative Class*

31